Littleton, Judge,
delivered the opinion of the court:
The arrangement which resulted in the incorporation of the plaintiff and the control by it of various patents relating to airplanes, whereby the Government was enabled to obtain and manufacture all the airplanes desired by it upon the payment of a royalty of $200 an airplane, which was, by agreement, reduced to $100 during a certain period, was brought about at the suggestion of the Secretary of / War and the Secretary of the Navy through the assistance j of the National Advisory Committee for Aeronautics. The"' arrangement and the practice under it related to all airplanes acquired by the Government. This should be kept *512 in mind throughout the case. The Secretaries of War and of the Navy had full authority to act in the premises and if in the arrangement and practice followed, as disclosed in detail by the findings, they had embodied the same in a formal written contract there could be no question but that plaintiff would be entitled to the royalties claimed in the amount of $363,600 in addition to those paid to it by the War and Navy Departments.
Between July 16, 1917, the date of plaintiff’s incorporation, and May 1924, the Government had paid royalties to the plaintiff in accordance with the original, the supplemental, and the cross-license agreements, either directly or through contractors, on 16,108 airplanes manufactured by or for the Government and received and used by it, in the manufacture of which airplanes various patents controlled by plaintiff were used. These royalties were at the rate of either $200 an airplane or $100 an airplane, depending upon the time they were made or acquired under contracts. Since May 20, 1924, to December 31, 1928, the effective date of the formal contract for the payment of royalties, the Government in the same manner paid to plaintiff royalties at the rate of $200 an airplane on 1,803 airplanes aggregating $360,600.
During the period of the war, ending July 2, 1921, the Government made in its own factories and duly reported to plaintiff 450 airplanes using the patents controlled by plaintiff, for which plaintiff was duly paid $100 an airplane, or $45,000. During the period of the war and until December 31, 1928, the Government manufactured in its own factories 22 airplanes and jjurchased from contractors who were not “ subscribers ” to the cross-license agreement 2,194 airplanes, all of which used the patented devices controlled by plaintiff and for which, under the original and supplemental agreements, the total of the reasonable royalties due plaintiff was $363,600. These 2,'216 airplanes are the ones involved in this proceeding and the royalties thereon constitute the claim for which plaintiff seeks judgment.
The Government agreed to make accurate quarterly reports to plaintiff of all airplanes made or purchased by it *513 upon tbe basis of which reports the plaintiff was to render invoices to the War and the Navy Departments respectively, for the royalties due thereon, which royalties were not to accrue and become payable until such reports were made and invoices received.
Of the 2,216 airplanes involved in this case 22 were manufactured by the Government during the period of the war but were not paid for nor reported to plaintiff until 1928. The Government purchased 1,179 airplanes during the war; and it likewise purchased 18 between July 2, 1921, and July 25, 1922; 825 between July 28, 1922, and March 31, 1928; and 172 between April 1 and December 31, 1928. The total of the royalties' due and unpaid on the 1,713 airplanes manufactured and purchased by the War Department is $277,900, and the total of the royalties due on the 503 airplanes manufactured or purchased by the Navy Department is $85,700. None of the royalties has been paid nor were any of the 2,216 airplanes involved, except one, reported by the Government to the plaintiff prior to September 19, 1923.
There is no dispute as to the number of airplanes using the patented devices controlled by plaintiff and the facts establish that the per-plane royalty sued for is in every case reasonable.
It is contended by the defendant, first, that plaintiff is not entitled to maintain this suit because it was not the absolute owner of the patents used on the airplanes manufactured or purchased by the Government; and, second, that $164,400 of the royalties sued for relate to airplanes manufactured or purchased by the Government prior to July 25, 1922, and is therefore barred by the statute of limitation.
Plaintiff contends that it has a right to maintain this suit and to recover the royalties claimed under implied contracts ; that no portion of the total royalties claimed is barred by the statute of limitation, inasmuch as the cause of action for such royalties did not accrue under the terms of payment of the original agreement, which terms were also applicable to the supplemental agreement and the Government’s special license agreement, until fifteen days after the date on which *514 the Government was required to report all airplanes manufactured or otherwise acquired by the War and the Navy Departments.
The facts summarized show that within the United States and during the period between July 24, 1917, and December 81, 1928, the Government made or purchased and used all the airplanes on which royalties are here sued for. Each airplane used devices of patents controlled by the plaintiff. No royalties have been paid on any of the airplanes involved and the total demanded represents reasonable royalties on the 2,216 airplanes in question.
The plaintiff was created in 1917 at the instance of the Government and in accordance with the plan evolved by it as the means of overcoming obstacles to the production of airplanes arising from disputes between patentees that were embarrassing the Government in its need for airplanes. The Government found itself in a situation where it was being required to pay amounts which it regarded as excessive for airplanes using certain patented devices. The purpose of the plan, which was carried out in practice, was to enable the Government to fulfill its needs for airplanes using patented devices upon payment to plaintiff of a stipulated royalty for each airplane. After full report from the agency designated to formulate a plan to overcome this difficulty, in one of which reports it was recommended that such royalties be regarded as an item of cost of airplane production, and after the Attorney General had approved the legality of the plan, the Secretaries of War and of the Navy approved the plan in all essential particulars. The substance of the arrangement and understanding between the Government and the plaintiff was that the War and Navy Departments would pay to plaintiff a certain amount on each airplane made or purchased as a royalty on certain patents which had been pooled for that purpose and were controlled by. plaintiff, and such royalty was to be paid by the Government on each airplane using devices of the patents, whether manufactured by the Government in its own factories or purchased and used by it from subscribers to the original cross-license agreement or from manufacturers who were nonsubscribers *515 thereto. Plaintiff licensed certain manufacturers who then had contracts for airplanes with the Government and they became stockholders or subscribers to the arrangement known as the cross-license agreement, but the Government was not limited to the purchase of airplanes from subscribers. It was free to purchase airplanes using the patented devices from other manufacturers who had not signed the cross-license agreement, and there was an implied agreement between the Government and the plaintiff that the Government would report such airplanes and pay to the plaintiff the stipulated royalty which should become due upon the receipt of invoices or bills from plaintiff.
After its organization, plaintiff for all practical purposes was referred to by the departments as owning or controlling these patents. The arrangement was to endure for about fifteen years. The disputing patentees who held legal title to the airplane patents agreed under the plan formulated and suggested by the Government that plaintiff, until November 1933, should license airplane makers to use the patented devices, should collect royalties and retain one eighth thereof, or 12%% of all royalties collected, and use the same to meet expenses of administering the plan and for other purposes, and should distribute the balance in specified proportions to the Wright and the Curtiss Companies who were the owners of the principal patents. After plaintiff’s organization all dealings with the Government were with the plaintiff. When the Government sought reduction of royalties for the period of the war and also the privilege of making in its own factories airplanes using the patented devices, it took these matters up with the plaintiff and not with the patentees. All reports of airplanes using patented devices, including the late reports by the Government of airplanes representing royalties here sued for, were made to the plaintiff. The Secretary of War referred to the legality of the right of plaintiff to license under the patents in question and both he and the Secretary of the Navy urged airplane manufacturers and patentees to accept the supplemental agreement which only varied the original by the reduction of royalties during the war. The recommendation of *516 the departments that royalties be treated as a part of airplane-production costs was adopted and observed in practice, and plaintiff was advised that such would be the practice. During the period from 1917 until the end of 1928 no one except plaintiff ever issued a license or collected a royalty. The only joint agreement by Wright, Curtiss, and the plaintiff with the Government was made pursuant to a provision of the original cross-license agreement and directed payment of royalties to plaintiff.
The Curtiss Company, one of the patentees, in its capacity as a manufacturer of airplanes for the Government, paid to plaintiff $969,900 as full royalties on all airplanes made by it during the war. It received from plaintiff in distributions to itself as a patentee $418,920, being 20 percent of the total royalties of $2,094,600 collected by plaintiff from all sources during that time. The whole of those royalty payments by the Curtiss Company was included in the total used in figuring the distributions to the Wright Company and to the Curtiss Company to make sure that such distributions during the war period had not exceeded $2,000,000 to both companies, as provided in the supplemental agreement suggested by the Government.
The Secretary of the Navy, who originated and carried into execution the plan, kept a careful check of the distributions on the basis agreed upon and he and the Secretary of War distinctly recognized the patents grouped in the plaintiff. In 1922, when called upon by plaintiff to report to it the airplanes here in suit so that plaintiff could bill the Government for royalties thereon, the Secretaries did not dispute plaintiff’s right to collect such royalties from the Government but recognized the same and excused its delay in reporting by urging a lack of necessary data and promised such reports as soon as possible so that plaintiff could bill for the royalties involved.
Soon after the ending of the arrangement for reduction of royalties for the war period, such arrangement being the so-called special-license agreement with the Government, negotiations were begun for a new royalty agreement. These were continued by the Government, through *517 the Secretaries of War and the Navy on the one hand and plaintiff on the other, until the end of 1928 when such new arrangement was entered into between them. That agreement, according to its title, granted a nonexclusive license to the Government under all airplane patents embraced therein and in accordance with the terms of the amended cross-license agreement with the plaintiff and recited that the plaintiff controlled and had the power to grant licenses under certain United States patents covering important inventions. It also provided for the termination of all formal and informal agreements between the Government and the plaintiff, except only such matters as were in dispute, which matters were those involved in the present action. By that agreement the Government was to pay the plaintiff specified royalties until October 31, 1933, the expiration date of patent #1203550, unless a specified total maximum should have been paid to plaintiff before that date, after which the uses would be free.
Intermediate of the negotiations, an acceptable form of agreement was reached containing a provision for payment to plaintiff of all royalties here in suit that had been, earned in prior years. In 1922 this agreement was submitted to the Attorney General, who, in 1925, ruled that payment with respect to airplanes used prior to the date of the agreement would have to be settled for otherwise than by a new contract, whereupon that feature was eliminated from the negotiations and the procedure indicated by the Attorney General was followed.
The post-war uses by the Government reducing the royalties claimed herein were enjoyed under a practice similar to that obtaining during the war, except for delay in reporting the airplanes used. In settling with a particular contractor the Government withheld royalties aggregating $14,000 on seventy airplanes, which it still holds, and these royalties are a part of those involved in this suit.
On March 1, 1927, after having checked the claims made by plaintiff at that time for royalties which are involved in this suit, the War Department approved the same for the amount claimed on the 1,545 airplanes theretofore used *518 by it and recommended payment of that sum. It further found that this number of airplanes had been made by or for, and received and used by, the War Department under and subject to the Government’s special-license agreement with the plaintiff.
The Secretary of the Navy on June 22, 1921, prepared and furnished the plaintiff with a report of the airplanes received and used by it from July 1, 1917, to July 1, 1926, which related to royalties payable on airplanes manufactured or procured by the Government.
In the circumstances of this case, we are of opinion that plaintiff has a right to maintain this suit. This is not a case involving the infringement of patents and the suit is not grounded upon the use by the Government of patents without license of the owner and without lawful right to use the same, but is one based upon an implied cpntract by the Government to pay plaintiff certain royalties for the use of certain patents used on airplanes made or purchased by the Government. For the purpose of the arrangement made, at the suggestion of the Government, all the patents on devices used on the airplanes were pooled and placed under the control of plaintiff, and thereafter the Government as well as all patentees recognized such control of plaintiff and its right to demand and collect the royalties provided for, and the patentees of the principal airplane patents paid to the plaintiff the agreed royalties on all airplanes manufactured by them in the same manner as such royalties were paid to plaintiff by the Government and the manufacturers who were not patentees. It was entirely a contractual arrangement, and we may lay aside the cases cited and relied upon' by the defendant involving suits for infringement which hold that only the patentee or the person having legal title to the patents may sue to recover damages or compensation for infringement.
In this case the Government used the patents in the manufacture of airplanes and used the airplanes embodying devices covered by the patents with the consent of the pat-entees and the plaintiff, and impliedly agreed to pay plaintiff a specified royalty on each airplane without further *519 liability to the patent owners. This was under an arrangement to which the patent owners agreed, whereby such patent owners had a right to receive and did receive out of all royalties paid to the plaintiff a certain specified distribution in full of all compensation due them for the use of their patents.
In addition to the control of the patents for contract purposes with the Government, the plaintiff had an interest to the extent of 12% percent of ail royalties collected, including those payable by the Government on airplanes made or purchased by it using devices covered by the patents; such interest amounts to $45,450 of the royalties claimed in this case. Cf. Ohio Oil Co. v. United States, 69 C.Cls. 137.
The next question is whether there was an implied contract between the Government and the plaintiff for the payment to the plaintiff by the Government of the royalties claimed in this suit.
An implied contract upon which a suit may be maintained under section 145 of the Judicial Code must be one implied in fact rather than in law. A contract implied in fact, or an implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, where the circumstances show, according to the ordinary course of dealing, and the common understanding, a mutual intent to contract. The nature of the understanding of the parties, whether the contract be express or implied, is the same, the only distinction being in the mode of proof. Both express contracts and contracts implied in fact are founded on the mutual agreement of the parties. The one class is proved by direct, and the other by indirect evidence; in other words, an express contract is proved by an actual agreement, while in the case of an implied contract it will be implied that the party made such an agreement as, under the circumstances disclosed, he ought in fairness to have made. The implication must be a reasonable deduction from all the circumstances and relations of the parties, their acts, and conduct, although *520 it need not be evidenced by any precise words and may result from random statements and uncertain language. In this case there was no formal written contract under which the Government agreed to pay the plaintiff royalties claimed in this suit. We think all the circumstances surrounding the matter of royalties on airplanes made or purchased by the Government using the devices covered by the patents controlled by the plaintiff, the acts and conduct of the parties, and their relations, establish an implied contract on the part of the Government to pay to the plaintiff the royalties which it now claims. This was the view of the arrangement taken by the parties, the Government being represented by the Secretary of War and the Secretary of the Navy who had authority to act for it.
The War and Navy Departments recognized the right of plaintiff to collect the royalties claimed on the airplanes made by or for the Government and the invoices or bills to the Government therefor rendered by the plaintiff, after it had received reports from these departments of the airplanes used by them containing the patented devices, were approved. Under the Attorney General’s opinion, however, the matter of payment of plaintiff’s invoices was referred to the Comptroller General for th§ purpose of stating an account. He first advised plaintiff that a certificate for the amount due would be issued but later refused such certificate and disallowed payment of the entire amount claimed, principally on the ground that under his view of the arrangement the patentees, Wright and Curtiss, who were entitled to distributions from the royalties collected by the plaintiff, had received the total amount to which they were entitled after which the Government was entitled to use airplanes containing devices covered by the patents without further payment of royalty. We think the interpretation by the General Accounting Office of the arrangement was not correct. It is not here urged by the defendant. Under the original cross-license agreement the Government was to pay the stipulated royalties until such time as the Wright and Curtiss companies had received in distributions from the plaintiff a maximum of $2,000,000 each. For the period between December 31,1917, and the end of the war, the per-plane royalty *521 on all airplanes manufactured or purchased by the United States was reduced and it was provided that whenever both the Wright and the Curtiss companies had together received $2,000,000, in the aggregate, for airplanes bought by the Government it would be released from further payments “ during the period of the present war.” The last-mentioned arrangement expired on July 2, 1921, at the termination of the war. The Wright and the Curtiss companies did not receive, and will not receive, in distributions from the plaintiff an amount in excess of the maximum authorized by the original and the supplemental agreements if judgment is rendered in favor of plaintiff for the amount claimed in this suit. The practical interpretation of the arrangement and the understanding by the parties during performance is of great importance. Insurance Co. v. Dutcher, 95 U.S. 269, 273; District of Columbia v. Gallaher, 124 U.S. 505, 510; Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118.
Under the arrangement disclosed by the facts, which was suggested by the Government and carried out in all of its details, the plaintiff was the only party who could have contracted with the Government. It was the only one who-had dealings with the Government in the matter. Every action was by or with it. All communications from the Government carrying matters of contract implication were with the plaintiff. All negotiations for the new agreement between the termination of the war in 1921 and the execution of that agreement at the end of 1928 were with plaintiff. The understanding with which the departments proceeded, in the meantime using the patented devices, was with plaintiff, as was the understanding by the Government that when data for reports of airplanes used, but theretofore unreported, could be secured, such reports would be made to the end that plaintiff might render invoices or bills for the royalties due by the War or Navy Departments. The Departments during the operations never questioned their obligation to pay royalty on every airplane used, regardless of who may have made it; or their obligation to report the unreported used airplanes, on the ground that they were not required to report or pay plaintiff therefor, because made by nonsubscribers. The findings establish *522 this and, further, that after the first general report of the War Department on September 19, 1923, of the then unreported airplanes made by nonsubscribers, the Government from time to time made further reports to plaintiff of airplanes used by it, made by manufacturers other than subscribers. There was no independent action by or with the patentees, Wright or Curtiss, or with any other subscribing patentee. The only alternative to a contract by implication with plaintiff would be a tortious infringement by the Government, but the findings of fact negative such possibility. The implied contract upon which this claim is based was wholly performed. St. Louis Hay & Grain Co. v. United States, 191 U.S. 159; Willard, Sutherland & Co. v. United States, 262 U.S. 489.
The last question is whether the royalties clue on airplanes manufactured by or for the Government and used by it during the period prior to July 25, 1922, are barred by the statute of limitation. Counsel for the defendant contends that, if there was an implied contract obligating the Government to pay royalties, plaintiff’s cause of action for such royalties accrued at the time the airplanes were made or purchased by the Government. On the other hand, the plaintiff contends that the statute of limitation did not begin to run in this case, except as to one airplane reported by the Government in October 1920, until sometime after September 19, 1923, in the case of royalties on airplanes used by the War Department and not until sometime after June 22, 1927, in the case of royalties on airplanes used by the Navy Department.
The statute of limitation, section 156 of the Judicial Code, provides that suits in this court shall be commenced within six years after the cause of action first accrues. The date on which a cause of action first accrues is not necessarily the same in every case. Ordinarily a cause of action accrues when the service is rendered or the articles are furnished and the obligation to pay therefor arises, but this is not a hard and fast rule and whether the cause of action in a particular case accrues at such time depends upon the agreement or arrangement between the parties. Their express agreement as to this in the case of a formal contract *523 or their understanding and course of conduct under an implied contract may fix a different time for the accrual of the claim for the purpose of computing the statute of limitation. We think the language of section 156, supra, was used with this in view for if it had been intended definitely to fix the time when the claim should accrue in every case, it would simply have provided that every suit should be commenced within six years after the service was rendered or the articles called for were furnished. In the case of a breach of a contract a cause of action accrues when the breach occurs. In this case there was no breach and the royalties claimed did not accrue and become payable under the agreement until reports had been made and invoices or bills rendered. There had been no refusal of the Government to pay prior to September 19, 1923. It is true that the royalties had not been paid, due to failure of the Government to report the airplanes made by it or acquired from nonsubscribers or stockholders of plaintiff, but the agreement and the practice under it fixed the time when the royalties should become due and when the plaintiff could demand payment. Compare Amy v. Dubuque, 98 U.S. 470; United States v. Taylor, 104 U.S. 216, 222; United States ex rel. Louisville Cement Co. v. Interstate Commerce Commission, 246 U.S. 638, 644; W. A. & G. Steam Packet Co. v. Sickles, 10 How. 419, 441; Mundt v. Sheboygan d¡ F. Dul. R. Co., 31 Wis. 451; Barnes v. City of Brooklyn, 22 N.Y., App. Div. 520. A claim may be said to accrue at one time for accounting purposes and at another, or later, time for the purpose of determining the statute of limitation within which suit may be brought. Smith Courtney Co. v. United States, 46 C.Cls. 262; Maneely, Admr., et al. v. United States, 68 C.Cls. 623, 631, 632; Penn Bridge Co. v. United States, 71 C.Cls. 273.
In Bull, Executor, v. Commissioner of Internal Revenue, 7 B.T.A. 993, 995, the United States Board of Tax Appeals said:
“A study of the multitude of decisions, treatises, and variously expressed views, and our experience in the consideration of many cases presented to this Board in which the word is either carefully or loosely used, disclose that *524 the word ‘ accrue ’ is fraught with confusion because expressed no certain concept. In law, it has long been used in respect of rights and obligations which are said to accrue when they become enforceable. In accounting, it may be variously used with equal authority to refer to a right or liability fixed in amount, or certain in all respects except amount, or to an apportionment of a right or liability which runs hand in hand with a matter upon which it depends, or to a reserve in anticipation of an event, sometimes certain and sometimes uncertain. Other connotations will occur, but these are sufficient to indicate that there is little in common among the significations recognized. One thing is clear — that the word implies the exclusion of ‘ received ’ or 1 paid ’, or a right or liability discharged. But short of this, what is meant when an item is accounted for as accrued depends upon the system of accounting in which it appears and the breadth of the accountant’s concept.
“ When, word as it appears in the revenue act, the interpretation cannot be fixed by definition, for this would imply a precision of congressional intention at variance with the more fundamental purpose to tax that which a proper system of accounting should clearly reflect as net income.”
The question of when an item accrues for the purpose of the income tax was the question before the courts in United States v. Anderson, 269 U.S. 422; American National Co., Receiver, v. United States, 274 U.S. 99; Lucas v. American Code Co., Inc., 280 U.S. 445; Lucas v. North Texas Lumber Co., 281 U.S. 11; Uncasville Mfg. Co. v. Commissioner of Internal Revenue, 55 Fed. (2d) 893; and Acme Coal Co. v. United States, 70 C.Cls. 696, 44 Fed. (2d) 95; and, for this reason, those cases are distinguishable. In the present case, for the purpose of accounting in determining whether the maximum distributable to the Wright and the Curtiss companies had been reached, royalties would only be payable on airplanes made by or delivered to the Government to the dates such airplanes were made or delivered.
This suit was begun July 25, 1928, and the six-year period of the statute would therefore extend back to July 25, 1922. Of the $363,600 royalties herein sued for, $199,200 thereof relates to royalties on airplanes indisputably made or purchased by the Government and placed in use after July 25, *525 1922. Only $164,400 of the total amount sued for can be-affected by the statute of limitation. The right to recover this amount depends upon the terms of the implied contract affecting the terms and conditions for the payment of royalties on airplanes manufactured by the Government and those acquired by it from persons other than subscribers to the original cross-license agreement. All persons making airplanes for the Government, and who were subscribers to the cross-license agreement, regularly and properly reported to plaintiff all airplanes made by them. The Government did not make reports to the plaintiff of all the airplanes manufactured by it and did not, until September 1928 and June 1927, report to the plaintiff any of the airplanes acquired and put in use by it from manufacturers other than subscribers to the cross-license agreement. Some of the airplanes upon which royalties are claimed in this suit were placed in use by the Government concurrently with airplanes made by the Government or by manufacturers who were' subscribers to the cross-license agreement, as to which airplanes the terms of payment were declared in writing. The practice as to time and manner of payment of royalties on all airplanes was uniform throughout all the years from 1917 to 1928. It conformed to the provisions of the original agreement which were applicable also to the supplemental and the Government’s special license agreement. Similar provisions were placed in the new contract, effective December 31, 1928, which brought to an end the period of the implied contracts involved in this proceeding. Inasmuch as those provisions corresponded to the practice they may be looked to as evidence as to what the practice was. Summarizing, the requirements were that (1) all airplanes manufactured or otherwise acquired by the War and the Navy Departments in any quarter of each calendar year were to be reported with specific data to the plaintiff in writing on the 10th day of the month next following that quarter; (2) forthwith, on receipt of each report, plaintiff was to render invoices to said Departments in accordance with certain reports; and (3) within a reasonable time (or 15 days) after the receipt of such invoices the *526 Government was to authorize and instruct its disbursing officers to make payments accordingly. The foregoing procedure leading up to payment was actually followed in operating practice with respect to all airplanes reported and paid for. Under such practice the Government, before paying the royalties, always insisted upon having invoices or bills from plaintiff covering airplanes on which the latter was claiming a royalty. The Government would not, and did not pay any such royalties until bills were rendered therefor. During the period of the war plaintiff rendered no invoices or bills tot the Government except for airplanes previously reported to it. It was recognized by all parties to the arrangement that plaintiff could not prepare and render invoices or bills without the information contained in those reports.
Another circumstance which throws light upon the question when the cause of action for the unpaid royalties accrued is the provision of a draft of a formal contract in August 1918 prepared by the Bureau of Aircraft Production for the War and the Navy Departments for execution by the plaintiff and the Government, but which was not executed because of the ending of the war, November 11, 1918. Paragraph 7 thereof provides that “ On the tenth day of January, April, July, and October of each year, the Government, through the War and Navy Departments, shall report to the association the number of airplanes built and accepted by the War and Navy Departments, during the three (3) months preceding, and, based upon said reports, payments of said royalties shall be made on the 25th of each such month. The first report shall be rendered on October 10, 1918, and shall cover the period from July 1, 1917, to October 1, 1918.”
Under the foregoing summary of the operating practices, we think payments of royalties were to be based upon and to be made fifteen days after the furnishing of each report for airplanes therein reported. In view of these terms, by implication, the case stands as if the parties by formal contract had agreed to a rightful use of the patented devices to pay reasonable sums as royalties for such use; and that payments should become due on demand accompanied by bills *527 based on and made from information contained in reports to be made quarterly for all airplanes manufactured by or sold and delivered to tbe Government in each quarter preceding any given report.
In Butler v. United States, 23 C.Cls. 335, 339, which was a suit upon an implied contract, the court pointed out that “ There was no express contract postponing the payment of the royalty or making it contingent upon a demand or other event; * * In Smith Courtney Co. v. United States, supra, the plaintiff contracted to sell metal for which the United States agreed to pay after presentation of bills, with proper evidence of delivery, inspection, and acceptance, and within ten days after warrant had been passed by the Secretary of the Treasury. The petition was filed July 1, 1909, so that the six-year period began to run July 1, 1903. In May 1901 it delivered the metal to the proper authorities and on May 23, 1903, the Government inspected and accepted it. June 6, 1903, bills with proper evidence were presented and accepted. But they were not passed upon by the Secretary of the Treasury until May 23, 1904. It was alleged that a reasonable time to pass upon the bills was within thirty days from their presentation. This court held that the right of action did not arise until a reasonable time had elapsed, ten days from such presentation to the Treasury; and that since the allegation that thirty days was a reasonable time was admitted by the demurrer, the right of action first accrued forty days after June 6, or on July 16, 1903, which was fifteen days within the statutory period. In overruling the demurrer and holding that the statute of limitation was not a bar, the court stated that “ It has been determined by the Supreme Court and this court, and is in fact elementary, that a right of action accrues and the statute of limitations begins to run when, and only when, the period of credit has expired; or, in other words, when an account is due and payable, or when there is a breach of the contract.” As the parties may specify such terms as price or time of payment by express contract, equally may they do so by implication of practice. In Penn Bridge Co. v. United States, supra, the plaintiff had contracted to *528 furnish and erect machinery in the Government navy yards. The contract provided that if the wages of labor should be increased above the rate prevailing when the contract was executed, the plaintiff would receive certain additional compensation therefor. The contract, however, provided “ That any increase over the wage rates prevailing at the date of the contract before being granted by the contractor shall be notified to and approved in writing by the Bureau of Yards and Docks. * * * Determination of such claims shall be deferred until the completion of the contract.”
The court held that the plaintiff’s right to recover additional compensation did not accrue when the machinery was delivered, but only after determination by the Bureau of Yards and Docks of the amount of increase in the prevailing wage rate, and the approval by that bureau. To hold that a right to sue for the royalties involved in this case arose the moment the airplanes were placed in use by the Government would, we think, be making an implied contract at variance with the practice, acts, and operations of the parties.. Such an arrangement, we think, was not contemplated by the parties. In the circumstances of this case, we think the statute of limitation did not begin to run with reference to the royalties herein sued for earlier than September 19, 1923, which was within six years prior to the filing of the petition on July 25, 1928.
There is included in plaintiff’s claim a royalty of $100 upon an airplane reported to plaintiff by the Government on October 6, 1920, for which royalty the plaintiff prepared an invoice and rendered a bill to the Government in 1921. Recovery of this royalty is clearly barred.
Judgment will be entered in favor of the plaintiff for $363,500. It is so ordered.
Williams, Judge; and GREEN, Judge, concur.
Wiialex, Judge, concurs in the conclusion.
Booth, Chief Justice, took no part in the decision of this case on account of illness.