**ALDER TERRACE, INC.,** Alder Terrace Associates and David A.Bolin, Sr., individually and as Trustee of the Irrevocable Living Trust of David A. Bolin, Sr., Plaintiffs–Appellants,

v.

**UNITED STATES,** Defendant–Appellee.

No. 98–5008.

United States Court of Appeals, Federal Circuit.

Nov. 24, 1998.

Bruce Babbitt, Jameson Babbitt Stites & Lombard, P.L.L.C., Seattle, Washington, argued for plaintiffs-appellants.

Brian M. Simkin, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel was Pete Giere, Office of the Assistant General Counsel, Washington State Office, Department of Housing and Urban Development, Seattle, Washington.

Before RICH, NEWMAN, and MICHEL, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL. Dissenting opinion filed by Circuit Judge PAULINE NEWMAN.

MICHEL, Circuit Judge.

Plaintiffs–Appellants Alder Terrace, Inc., Alder Terrace Associates, and David A. Bolin, Sr. (collectively, the "Developer") appeal from the judgment of the United States Court of Federal Claims dismissing their complaint pursuant to Rules 12(b)(1) and (4) of the Rules of the United States Court of Federal Claims for lack of jurisdiction and for failure to state a claim upon which relief can be granted. *See Alder Terrace, Inc. v. United States,* 39 Fed.Cl. 114 (1997). Oral argument was heard on September 3, 1998. Because the Developer's claims for breach of contract or, alternatively, for just compensation under the Takings Clause of the Fifth Amendment accrued when enactment of a statute vitiated the Developer's contractual right to prepay its loan more than six years before the Developer filed suit, we agree with the Court of Federal Claims that the Developer's claims were barred by that court's six-year statute of limitations and therefore affirm its dismissal of the action.

## BACKGROUND

This case concerns an alleged government-caused breach of certain contracts between the Department of Housing and Urban Development ("HUD") and the Developer for the construction and operation of rental housing for low income persons in Ellensburg, Washington. The contracts were entered into and performed pursuant to a complex statutory and regulatory scheme (the "Program"), the evolution of which is described comprehensively in the Court of Federal Claims's opinion in this case as well as those deciding *Anaheim Gardens v. United States,* 33 Fed. Cl. 773 (1995), and *Cienega*

*Gardens v. United States,* 33 Fed. Cl. 196 (1995). Only the aspects of the Program relevant to our decision will be described here.

The events relevant to this decision began when the Developer contracted with HUD pursuant to section 221(d)(3) of the National Housing Act, 12 U.S.C. §§ 1715*l* (d)(3), 1715*z*–1, to construct a fifty-one unit housing project named "Alder Terrace." The National Housing Act was expressly "designed to assist private industry in providing housing for low and moderate income families and displaced families." *Id.* § 1715*l* (a). To this end, the statute authorized HUD [1] to insure mortgages "upon such terms and conditions as [HUD] may prescribe." *Id.* § 1715*l* (b). Thus, a developer enters the Program when HUD becomes a party to the financing of its housing project. In return for HUD insuring its loan, a developer submits to HUD regulation of its housing project.

### Entering the Program

The Developer executed a promissory note (the "Note") to its lender, Sparkman and McLean Company, secured by a long-term deed of trust on January 4, 1968. In accordance with the statute, HUD and the Developer's lender then entered into a contract for mortgage insurance dated January 6, 1968. The Developer qualified for such mortgage insurance because it was a "limited distribution mortgagor" as defined by HUD regulations:

> The limited distribution mortgagor shall be a corporation, trust, partnership, association, other entity, or an individual. Such mortgagor shall be restricted by law (or by [HUD]) as to distribution of income [2] and shall be regulated as to rents, charges,

rate of return, and methods of operation in such form and manner as is satisfactory to [HUD] to effectuate the purposes of this provision.

24 C.F.R. § 221.510(c).[3] Pursuant to these statutory and regulatory provisions, the Developer entered into a "Regulatory Agreement" with HUD regarding the operation of Alder Terrace, which governed such matters as tenant eligibility, rent rates, profits, maintenance, and finance. The Regulatory Agreement was to remain in place as long as HUD insured, or had the obligation to insure, the mortgage on Alder Terrace.

In accordance with the applicable regulation, HUD's insurance of the Developer's mortgage loan was indicated by an endorsement on the Note. *See* 24 C.F.R. § 207.254(a). The effect of such an "initial endorsement" is that HUD, the Developer, and the lender "shall be bound by the provisions of [24 C.F.R. Part 207, Subpart B] to the same extent as if they had executed a contract including [those] provisions ... and the applicable sections of the [National Housing Act]." 24 C.F.R. § 207.254(c).

The Note provided that prepayment prior to the final maturity date was not permitted without the approval of HUD. However, in accordance with the regulations, the Note also provided that "a maker which is a limited dividend corporation may prepay without such approval after twenty (20) years from the date of final endorsement of this note by [HUD]." [4] Because the Developer qualified as a limited dividend (distribution) corporation and because the final endorsement was dated January 5, 1969, the Developer was contrac-

---

1. The Federal Housing Administration was originally authorized to operate this mortgage insurance program. However, in 1965 the Federal Housing Administration's functions were transferred to, and assumed by, HUD. *See* 42 U.S.C. § 3534(a); 24 C.F.R. §§ 200.1–200.4. For simplicity, this opinion will replace references in statutes, regulations, or written instruments to the Federal Housing Administration or its head, the Federal Housing Commissioner, with references to HUD.

2. Distributions of surplus cash were limited to six percent of the owner's initial equity investment in the project. *See* 24 C.F.R. §§ 221.531(b), 221.532(a).

3. All references in this opinion to the Code of Federal Regulations are to the edition applicable to the date when the described actions or determinations occurred.

4. 24 C.F.R. § 221.524(a)(ii) provides that a "mortgage indebtedness may be prepaid in full and [HUD's] controls terminated without the prior consent of [HUD] ... [w]here the mortgagor is a limited distribution type, which is not receiving payments from [HUD] under a rent supplement contract executed pursuant to the provisions of [24 C.F.R. Part 215] and where the prepayment occurs after the expiration of 20 years from the date of final endorsement of the mortgage."

tually entitled to prepay the Note after January 5, 1989.

Meanwhile, on February 5, 1988, the Emergency Low Income Housing Preservation Act of 1987 (the "Emergency Act"), Pub.L. No. 100–242, 101 Stat. 1877 (1988) (codified at 12 U.S.C. § 1715*l* note (1988)), was enacted. This was a temporary measure placing a two-year moratorium on unconditional, unilateral prepayments of HUD-insured mortgage loans. Under the Emergency Act, an eligible project owner wishing to prepay its mortgage loan was required to file a "notice of intent" and "plan of action" with HUD. *See* 101 Stat. 1879. Before approving such a plan of action, the Emergency Act required that HUD make a written finding (1) that implementation of the plan of action would not "materially increase economic hardship for current tenants" or "involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available"; and:

> [ (2) that the] supply of vacant, comparable housing [would be sufficient to ensure that the prepayment would] not materially affect . . . (i) the availability of decent, safe, and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve; (ii) the ability of lower income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or (iii) the housing opportunities of minorities in the community within which the housing is located. . . .

101 Stat. 1880. As directed by the statute, HUD issued interim implementing regulations on April 5, 1988, and final regulations on September 21, 1990, which were codified at 24 C.F.R. Part 248. Because no suitable, alternative housing was available in the area served by Alder Terrace, the Developer was unable to satisfy these prepayment conditions as of January 5, 1989.

On November 28, 1990, the Low–Income Housing Preservation and Resident Home-ownership Act of 1990 (the "Permanent Act"), Pub.L. No. 101–625, 104 Stat. 4249 (codified at 12 U.S.C. §§ 4101–4147 (1994)), was enacted. The Permanent Act made permanent the Emergency Act's temporary re-strictions on prepayments of HUD-insured mortgage loans (with certain modifications that are not material to this decision). The Permanent Act additionally provided that owners who no longer wish or are unable to continue in the government's housing program, may sell to third parties approved by HUD, at a price determined by HUD, and subject to HUD's approval of financial assistance and the availability of funds. HUD proposed interim implementing regulations on April 8, 1992, which became effective on May 8, 1992, and which are codified at 24 C.F.R. Part 248. As with the Emergency Act, the Developer was unable to satisfy the Permanent Act's conditions for prepayment.

In the interim, on December 19, 1988, following a refusal by HUD under the April 1988 interim regulations to allow prepayment, the Developer caused Riley Mortgage Group, Inc., the mortgage servicer, to send a request to HUD for voluntary termination of mortgage insurance. This request preceded the Developer's twenty-year prepayment date of January 5, 1989 by several weeks. On July 31, 1989, HUD finally approved the request and placed an endorsement on the Note stating that the insurance had been canceled. The cancellation was made retroactive to December 19, 1988, and the Seattle Region X office of HUD accordingly removed Alder Terrace from its inventory of HUD-controlled projects.

At the time of the cancellation, it was HUD's policy, in accordance with its interpretation of the Emergency Act as then in effect, to treat requests for termination of mortgage insurance (as opposed to mortgage prepayment) as non-discretionary when made jointly by the mortgagor and mortgagee. However, the Emergency Act was amended in December 1989 to provide expressly that it was intended to restrict, not just mortgage loan prepayment, but also the termination of HUD mortgage loan insurance. *See* Department of Housing and Urban Development Reform Act of 1989 (the "Reform Act"), Pub.L. No. 101–235 § 202, 103 Stat. 1987 (1990) (codified at 12 U.S.C. § 1715*l* note (1994)). Cancellation of HUD mortgage insurance frees a developer from the restrictions on rent levels and other such

constraints embodied in the Regulatory Agreement.

Following the enactment of the Reform Act, a group of Alder Terrace tenants brought a class action in the United States District Court for the Eastern District of Washington, challenging the termination of the mortgage insurance and seeking to reinstate the project's Regulatory Agreement and, hence, HUD's regulation of the project (the "*Neufeld* class action"). HUD made an offer of judgment on September 24, 1990, confessing the wrongful nature of the cancellation of the mortgage insurance and a preliminary injunction was granted on October 1, 1990. On October 6, 1992, the district court granted summary judgment to the plaintiffs, holding that HUD's termination of mortgage insurance violated the Administrative Procedure Act and that the Developer's attempted termination of HUD regulation of its housing project was legally deficient and not in compliance with the Emergency Act. *See Neufeld v. HUD,* No. CY–90–3057–FVS (E.D.Wa. Oct. 6, 1992). The court ordered restoration of the Regulatory Agreement and that the parties be returned to the positions they occupied prior to the termination of the mortgage insurance. *See id.* slip op. at 13–14.

### The Lawsuit

On August 13, 1996, the Developer filed its complaint in the Court of Federal Claims. The Developer alleged that the enactment of the Emergency Act and the Permanent Act improperly breached its prior agreement entitling it to prepay its HUD-insured loan after twenty years. It further contended that, as a result of this breach, it has suffered severe financial loss, has been compelled to convey property to a third party, has been embroiled in costly litigation with third parties, and has been deprived of the right to use and dispose of its property as it sees fit. Moreover, the Developer also alleged that the Permanent Act's standards were impossible for it to satisfy because the government allegedly anticipated the Developer's intention to exercise its right to prepay and so made no suitable, alternative housing available in the area of Alder Terrace. Accordingly, the Developer sought damages for breach of contract or, alternatively, just compensation under the Takings Clause of the Fifth Amendment.

On September 4, 1997, the Court of Federal Claims granted the government's motion to dismiss on the grounds that the Developer's claims were barred by the six-year statute of limitations. The Court of Federal Claims relied principally on *Annaheim Gardens* in holding that the Developer's claims accrued, and thus the statute of limitations period began to run, no later than January 5, 1989, that is, the twenty year prepayment date. Because the Developer did not file its complaint until August 13, 1996, more than seven-and-a-half years after this date, the Court of Federal Claims held the Developer's claims to be barred under the applicable statute of limitations. *See* 28 U.S.C. § 2501 (1994).

On appeal, the Developer argues that the Court of Federal Claims erred because the Alder Terrace housing project was allegedly not a part of the HUD regulatory program on the twenty year prepayment date of January 5, 1989 but, rather, only reentered the regulatory program as a result of the preliminary injunction in October 1990. Thus, the Developer asserts that its claims did not accrue until October 1990 (thereby causing its August 13, 1996 complaint to be timely) because before that date it could not have known that it had a claim. Finally, the Developer also argues that the Court of Federal Claims erred because it started to run the statute of limitations in January 1989—before the final prepayment regulations were issued pursuant to the Permanent Act in 1992 and even before the final implementing regulations were promulgated under the Emergency Act in 1990.

### ANALYSIS

#### I.

 Under the applicable statute of limitations, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). The six-year statute of limitations set forth in the statute is an "express limitation on the Tuck-

er Act's waiver of sovereign immunity," *Hart v. United States,* 910 F.2d 815, 817 (Fed.Cir. 1990), and consequently may not be waived by either the Court of Federal Claims or the parties, *see id.* at 818–19. As the plaintiff in the underlying suit, the burden of establishing jurisdiction, including jurisdictional timeliness, must be carried by the Developer. *See McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Because jurisdictional determinations are questions of law, we review *de novo* the Court of Federal Claims's decision to dismiss the Developer's suit as barred by the statute of limitations. *See Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1576 (Fed.Cir.1992).

## II.

The Developer's complaint was filed on August 13, 1996. Accordingly, to be timely filed, the Developer's claims must have first accrued no earlier than August 13, 1990. We agree with the Court of Federal Claims that the Developer's claims accrued prior to August 13, 1990, and are therefore without the jurisdiction of that court as statutorily time-barred.

■ A claim first accrues for purposes of 28 U.S.C. § 2501 "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *See Kinsey v. United States,* 852 F.2d 556, 557 (Fed.Cir.1988) (quoting *Oceanic Steamship Co. v. United States,* 165 Ct.Cl. 217 (1964)); *see also Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988) (stating that a claim accrues only when "all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence"). Generally, "[i]n the case of a breach of a contract, a cause of action accrues when the breach occurs." *Manufacturers Aircraft Ass'n v. United States,* 77 Ct.Cl. 481, 523 (1933); *see also Brighton Village Assocs. v. United States,* 52 F.3d 1056, 1060 (Fed.Cir.1995). Although "a claim does not accrue until the claimant has suffered damages," *Terteling v. United States,* 167 Ct.Cl. 331, 334 F.2d 250, 254 (Ct.Cl.1964), it is not necessary for purposes of claim accrual that the claimant be able to calculate the precise, final *quantum* of damages, *see*

*Alder v. United States,* 785 F.2d 1004 (Fed. Cir.1986).

■ In the instant case, both the enactment of the Emergency Act, which first imposed restrictions on the right to repay, and the twenty-year prepayment date, upon which date the Developer was first prevented from prepaying, occurred prior to the necessary accrual date of August 13, 1990. Indeed, the Emergency Act was enacted on February 5, 1988, and the twenty-year prepayment date occurred on January 5, 1989. Under the Developer's theory of recovery, with the Emergency Act in force and placing restrictions on the Developer's right to prepay, the Developer first suffered its alleged breach of contract damages on January 5, 1989, when it was thereby prevented from exercising its express contractual right then to prepay. Accordingly, we agree with the Court of Federal Claims that the Developer's claims accrued no later than January 5, 1989—some seven-and-a-half years before the Developer actually brought suit.

■ The Developer contends that its claim could only have first accrued when the Permanent Act was enacted on November 28, 1990, or, at least, not before HUD promulgated its final implementing regulations under the Emergency Act on September 21, 1990. We are not persuaded by either argument. The fact that the Emergency Act was expressly a temporary measure does not impact our analysis. On January 5, 1989, the Emergency Act was in force and, under the Developer's analysis, was preventing the Developer from exercising its prepayment right. All litigants are, of course, charged with knowledge of the United States Statutes at Large. *See Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). The fact that the Emergency Act's restrictions were set to expire just over one year later does not alter the fact that, under its theory of recovery, the Developer began to suffer damages on January 5, 1989. These alleged damages were suffered as a result of the Emergency Act and its interim regulations, both of 1988. The fact that the final regulations had not yet been promulgated in no sense lessened the restrictions on the Developer's prepayment right. More-

over, the subsequent restrictions put in place by the Permanent Act were simply a continuation of the same restrictions set forth in the Emergency Act. Thus, while the Permanent Act may have affected *quantum*, its enactment did not affect claim accrual.

■ We are also unpersuaded that HUD's cancellation of mortgage insurance on July 31, 1989, retroactive to December 19, 1988, prevented the Developer's claims from accruing on January 5, 1989. On January 5, 1989, the Developer had a vested contractual right to prepayment which was nullified by the Emergency Act. Moreover, on that date it did not know and could not have known that its mortgage insurance would subsequently be canceled with retroactive effect some seven months later. Consequently, the Developer was entitled "to institute an action" on January 5, 1989 and thus that date is when its claims accrued.

■ Moreover, the fact that HUD in July 1989 was interpreting the Emergency Act as requiring it to approve all requests for cancellation of mortgage insurance when made jointly by the mortgagor and mortgagee, is further unavailing to the Developer because that agency interpretation was incorrect. In *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564 (Fed.Cir.1993), we held that a tribe's breach of contract and Takings claims accrued on the date of the enactment of a statute altering the tribe's relationship with the federal and state government. This accrual date was used despite the fact that the Department of the Interior had interpreted the statute as not affecting the tribe's claim to certain lands, which interpretation was subsequently held to be erroneous by the Supreme Court. *See South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 510–11, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). In holding that the accrual date was the date of enactment of the erroneously interpreted statute (some twenty-eight years before the suit was filed), rather than the date of the Supreme Court's interpretation of the statute (four years before the suit was filed), we explained that:

> While the Supreme Court's pronouncement in 1986 might be relevant to fixing the time when the Tribe *subjectively* first knew what the Act meant, it is fundamental jurisprudence that the Act's *objective* mean-

ing and effect were fixed when the Act was adopted. Any later judicial pronouncements simply explain, but do not create, the *operative* effect.... Whether the harm was caused to the Tribe by the Act itself or by government misrepresentations about what the effect of the Act might be, the "damage" was done when the Act became effective in 1962.

*Catawba Indian Tribe*, 982 F.2d at 1570–71. In the instant case, therefore, the fact that HUD may have been incorrectly interpreting the Emergency Act to require cancellation of mortgage insurance when mutually sought by the mortgagor and mortgagee is irrelevant to the accrual date if that interpretation was subsequently found to be incorrect.

Here, HUD's interpretation of the Emergency Act was indeed held incorrect. The Reform Act, enacted in December 1989, contained a section entitled "Clarification of Applicability to Voluntary Termination of Insurance," making plain that the restrictions of the Emergency Act were always intended to apply to termination of mortgage loan insurance just as much as to mortgage loan prepayments. *See* Pub.L. No. 101–235 § 202. While in the form of a "Clarification" amendment, the Reform Act indicated a prior legislative intent to apply the Emergency Act's restrictions to the termination of mortgage insurance. Accordingly, under *Catawba Indian Tribe* we must rely on the date of enactment of the Emergency Act (and then, by extension, the date upon which the Developer's contractual rights vested and so were allegedly negated by the statute), rather than the date upon which HUD's interpretation of the statute changed.

In addition, even more compelling than the situation in *Catawba Indian Tribe*, the Reform Act was enacted more than six years before the Developer brought suit. Accordingly, in December 1989, more than six years before the Developer brought its action, there was clear and unmistakable public notice that HUD had erroneously interpreted the Emergency Act to permit the Developer voluntary termination of its mortgage insurance. This utterly belies the Developer's contention that it only became aware of restrictions on its right to terminate its mort-

gage insurance when the *Neufeld* class action court issued its preliminary injunction in October 1990. Not only did the February 1988 enactment of the Emergency Act itself provide notice that mortgage insurance could not be terminated voluntarily, but so, even more expressly, did the December 1989 Reform Act. Any notion that the Developer would somehow be permitted to terminate its mortgage insurance in contravention of the Emergency Act and the Reform Act was surely put to rest by the filing of the *Neufeld* class action some six years and one month prior to the Developer filing suit in the Court of Federal Claims.[5] Consequently, there was undoubtedly public notice more than six years before the Developer filed suit over restrictions on its ability to terminate its mortgage insurance and prepay its loan, ending HUD regulation of its project.

Finally, we are entirely unconvinced that the issue of whether the Developer could cancel or had canceled its mortgage insurance is relevant to the accrual of the claims at issue. The Developer's suit in the Court of Federal Claims alleges damages that resulted from the failure to allow prepayment according to the contract. If the government did indeed breach by statutorily prohibiting exercise of the contractual prepayment right, then liability would result from this breach even if the Developer by necessity then withdrew from the Program by obtaining voluntary cancellation of its mortgage insurance.

## CONCLUSION

The Developer's claims accrued on its contractual twenty-year prepayment date of January 5, 1989, more than six years before the Developer filed suit. This accrual date is unaffected by HUD's subsequent retroactive (and improper) cancellation of mortgage insurance and later statutes and regulations. Moreover, the Developer was on notice that the Emergency Act of 1988 and its 1988 interim implementing regulations negated its contractual prepayment right, effective in January 1989. Accordingly, the dismissal of

the Developer's lawsuit by the Court of Federal Claims is

*AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

I respectfully dissent. The statute of limitations can not start to accrue until the party can have brought an action to enforce a legal right or seek a legal privilege. Alder Terrace, having been released from the restrictions of the program as of December 1988 or July 1989, was free of the constraints imposed by the ELIHPA. No period of limitations could accrue, because the plaintiff had no claim. Alder's contract with HUD was over; there was no breach by HUD, and thus no claim upon which Alder could sue.

Alder's claim accrued, at the earliest, on October 1, 1990, upon HUD's offer of judgment and the ensuing injunction which invalidated Alder's departure from the program and reinstated HUD's restrictions. The only other date that could have started the period of limitations was November 28, 1990, the date of enactment of the LIHPRHA, which made the moratorium permanent. Counted from either date, this suit is not time-barred.

For a cause of action to accrue, there must be a legal right to maintain the action. That right was not present earlier than six years before the filing of this suit.

---

5. Upon the filing of the *Neufeld* class action suit it was apparent that a victory for the plaintiffs would result in the reinstatement of the Regulatory Agreement and the other Emergency Act restrictions. To preserve its possible claims, the Developer could have filed a protective action in the Court of Federal Claims and moved for a suspension of the proceedings pending the resolution of the *Neufeld* class action. *See Brighton Village Assocs.,* 52 F.3d at 1060. It did not elect to do so.