stage of the litigation. That might be a good idea.

**M.A. MORTENSON COMPANY,**
Appellant,

v.

**Les BROWNLEE, Acting Secretary of the Army, Appellee.**

No. 03–1276.

United States Court of Appeals, Federal Circuit.

DECIDED: April 7, 2004.

John H. Guin, Winston & Cashatt, of Spokane, WA, argued for appellant. On the brief was Robert H. Crick. Of counsel was C. Matthew Anderson.

Gregory R. Firehock, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. On the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Donald E. Kinner, Assistant Director; and Thomas B. Fatouros, Trial Attorney. Of counsel on the brief was Gregory W. Vanagle, Attorney, United States Department of the Army, Army Corps of Engineers, of Elmendorf AFB, AK.

Before MAYER, Chief Judge, RADER and SCHALL, Circuit Judges.

MAYER, Chief Judge.

M.A. Mortenson Company ("Mortenson") appeals the decision of the Armed Services Board of Contract Appeals concluding that it is not entitled to an equitable adjustment for installing manual balancing dampers at all points in the duct system where duct sizes change. *M.A. Mortenson Co.*, ASBCA No. 53431, 03–1 B.C.A. (CCH) ¶ 32,078, 2002 WL 31501914 (2002). The board determined that the drawings in the contract clearly required installing the manual balancing dampers at all such points. Because we conclude that the specification and the drawings were unambiguous in their requirements for manual balancing dampers at all points in the duct system where duct sizes change, we affirm.

*Background*

On September 16, 1994, the United States, acting through the Army Corps of Engineers, awarded Mortenson Contract No. DACA85–94–C–0031 for the construction of the Composite Medical Facility at Elmendorf Air Force Base in Anchorage, Alaska ("the project"). Mortenson, as the prime contractor to the government, subcontracted the mechanical portion of the project to W.A. Botting Company/The Poole & Kent Company, A Joint Venture ("BPK"), who in turn subcontracted the installation of the project's heating, ventilation, and air conditioning ("HVAC") ductwork to SSM Industries, Inc. ("SSM"). Mortenson relied in part on SSM's interpretation of the contract to prepare its bid.

The contract divided the project's HVAC system into three zones, which collectively is known as the integrated building system. The two zones relevant to this appeal are the distribution zone—the space "from either the roof or the floor slab of the room above down to a walk-on deck"—and the connection zone—"the space between the walk-on deck and the finished ceiling for the occupied space below." *M.A. Mortenson Co.*, 03–1 B.C.A. (CCH) at 158,524. Within these zones, manual balancing dampers (also referred to throughout the contract as "volume dampers") were to be installed at specific points in the ductwork. These dampers would allow manual variance of the volume of air in the ductwork to maintain balance within the system.

To determine the number of manual balancing dampers required by the contract, SSM looked to both the specifications and the drawings of the contract. Contract specification 15895.2.7.2.5 called for manual balancing dampers to "be provided at points on supply, return, and exhaust systems where submains, branch mains, or branches and run-outs are taken from larger ducts." Plan Drawings M1.201–M1.232 and M1.301–M1.333 showed the layout of the connection zone and required "a manual volume damper at each branch/runout take-off." Plan Drawings M1.250–M1.281 and M1.350–M1.382 showed the layout of the distribution zone

and required "a manual balancing damper at each terminal unit run-out duct." Both the connection zone and distribution zone drawings also required that "all devices and equipment indicated on [the] plan shall be fabricated and/or installed in accordance with the applicable typical details on the M6 series of drawings of these contract documents." SSM concluded from this information that the project required installation of 2,936 manual balancing dampers, and Mortenson's bid reflected this conclusion.

After SSM purchased and installed the manual balancing dampers for the project, Mortenson requested that BPK "[v]erify that balancing damper [sic] are install [sic] at all duct branches, flexible take-offs, and ducts taps [sic] as specified in section 15895.2.7.2.5." In response, BPK initiated a request for information on November 8, 1996, to confirm whether the work completed on the project complied with the relevant specification. On November 26, 1996, the contracting officer's representative replied as follows: "Do not confirm your interpretation. Provide and install manual balancing dampers at all locations specified in TS 15895.2.7.2.5, as indicated on details 5, 6, and 7/M6.02, on all terminal unit run-out ducts . . ., at each branch duct or run-out take-off . . . and at all other locations shown in the contract documents."

On January 22, 1997, SSM noted that it was proceeding "under protest" and subsequently installed the additional 1,283 manual balancing dampers needed to satisfy the government's request. Mortenson then filed a pass through claim with the contracting officer for an equitable adjustment of $297,608—the cost for installing the additional dampers—which was denied in a final decision dated June 5, 2001. Mortenson timely filed an appeal with the board, and now timely appeals the board's decision here. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) (2000).

## Discussion

■ In reviewing a board's decision, we will not set aside a decision on any question of fact "unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 409(b) (2000). We review decisions on questions of law *de novo. Eastman Kodak Co. v. Rumsfeld,* 317 F.3d 1377, 1379 (Fed.Cir.2003) (citing 41 U.S.C. § 409(b) (2000)). Contract interpretation is a question of law; therefore, the board's decisions regarding this matter are not binding. *R.B. Wright Constr. Co., v. United States,* 919 F.2d 1569, 1571 (Fed.Cir. 1990). Because "the board has considerable experience and expertise in interpreting government contracts," however, "its interpretation is given careful consideration and great respect." *Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993).

The crux of this appeal is whether the language "provided at points" in specification 15895.2.7.2.5 means "provided at all points" or "provided at various points." Mortenson argues that the "provided at points" language, when read in light of what the contract drawings show, must mean the latter, and the government's requirement that manual balancing dampers be installed at all points where larger ducts meet smaller ones constitutes a change in the contract. The government agrees with the board's conclusion that "the contract drawings require manual balancing dampers at each point where a smaller duct connects to a larger duct for all types of pressure ducts and in all zones including the distribution zone," and consequently the installation of the 1,283 manual

balancing dampers was required for performance to comport with the original terms of the contract. *M.A. Mortenson Co.*, 03–1 B.C.A. (CCH) at 158,527.

■ In resolving disputes involving contract interpretation, we begin by examining the plain language of the contract. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991). We must construe the contract "to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir.2002). In this case, we see the government's interpretation as the only one that can effectuate the purpose of the contract. Specification 15895.2.7.2.5 requires the installation of manual balancing dampers "at points . . . where submains, branch mains, or branches and run-outs are taken from larger ducts." The language is not conditional in any way, and it makes no exceptions or distinctions for ductwork located in any particular section of the integrated building system. Mortenson, SSM, or any other party reading this provision of the contract would have no reason to believe that the language meant anything other than what it plainly stated. Mortenson's arguments to the contrary do not pass muster.

Mortenson contends that interpretation of the contract in this case should be governed by the drawings rather than the specification. To support this assertion, it points to specifications 15895.1.1 and 15895.2.7.1, which purportedly incorporate by reference the Sheet Metal and Air Conditioning Contractors' National Association ("SMACNA") HVAC Duct Construction Standards as part of the contract. SMACNA standards require "[d]esigners [to] show all required air volume control devices on the contract drawings." Thus, Mortenson's interpretation of specification 15895.2.7.2.5 was the correct one because the drawings require installation at some,

but not all, relevant points. Mortenson's conclusion is unsound because it stems from invalid premises.

■ The premise that the drawings should dictate the requirements of the contract is simply wrong. While SMACNA standards "form[ed] a part of [the] specification" of the contract, they did so only "to the extent referenced." Specification 15895.2.7.1 required only that "[a]ll aspects of metal ductwork construction . . . comply with applicable SMACNA Standards"; it did not extend application of those standards to contracting. Thus, the government was under no obligation to comply with the SMACNA mandate that designers show all required manual balancing dampers in the drawings. Additionally, Contract Clause I.76 provides, "In case of difference between the drawings and specifications, the specifications shall govern. . . ." Given these circumstances, contract interpretation must begin with the specification.

The premise that the drawings did not require installation at all points where smaller ductwork connected to larger ductwork is also wrong. The board found that all drawings relevant to the layout of the connection zone and distribution zone required that devices be installed "in accordance with the applicable typical details on the M6 series drawings." *M.A. Mortenson Co.*, 03–1 B.C.A. (CCH) at 158,525. The board also noted: "Details 5 and 7 of contract drawing M6.02, which is an M6 series drawing, depict a manual balancing damper on a smaller duct where it connects to a larger duct (findings 11, 12). Each detail is labeled as being typical and is not marked that it does not apply to any type of pressure duct or IBS zone (*id.*)." *Id.* at 158,527. Mortenson maintains, however, that Typical Detail 10 of drawing M6.02, which depicts ductwork in the connection zone only, limits the applicability of

Details 5 and 7 to the connection zone because of the allegedly limiting reference it makes to them. But these references— specifically, "see detail. 7/M6.02" and "see detail 5/M6.02"—clearly do not serve to limit the applicability of the details to only those situations depicted in Detail 10. They serve merely to further inform Detail 10 without having to depict such information in so small a space. Because we disagree with Mortenson's contention that Details 5 and 7 have limited applicability due to Detail 10, and because the board's factual findings are amply supported by the record, we agree with the board's interpretation of the contract drawings. The drawings require manual balancing dampers at each point where a smaller duct and a larger duct connect, regardless of integrated building system zone. *Id.* Mortenson's contention that specification 15895.2.7.2.5 reads "at various points" because the drawings so require, then, is incorrect.

In the alternative, Mortenson argues that, at a minimum, its interpretation was reasonable and therefore rendered the contract latently ambiguous. We disagree that Mortenson's interpretation was reasonable, given the plain language of the specification and the requirements of the drawings. For the sake of argument, however, if any ambiguity pertaining to manual balancing dampers did exist within the contract, that ambiguity was patent. *See Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir.2000) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."). After installation of the initial manual balancing dampers, Mortenson's own quality control officer—not the government's—requested verification that the installation complied with the contract. This request was not spawned by any communication with the government concerning manual balancing damper installation, nor was it based on information received after the contract had been awarded. Thus, any uncertainty about the requirements of manual balancing dampers should have manifested before Mortenson had submitted its bid. Mortenson therefore should have sought clarification of the ambiguity before the end of the procurement process, not after installment of the manual balancing dampers, "and its failure to do so precludes acceptance of its interpretation." *Id.* (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996)); *see also Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1306 (Fed.Cir.1996) (quoting *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 998 (Fed.Cir.1996)).

### Conclusion

Accordingly, the decision of the Armed Services Board of Contract Appeals is affirmed.

*AFFIRMED.*