**Ross M. PONTHIE and Grace Y. Ponthie, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 09–122C.**

United States Court of Federal Claims.

April 12, 2011.

Todd Patrick Lewis, Conner & Winters, LLP Fayetteville, AR, for plaintiffs.

Michael Damien Snyder, Department of Justice, Commercial Litigation Branch, Washington, DC, for defendant.

## OPINION AND ORDER

BOHDAN A. FUTEY, Judge.

This case concerns two different disputes between the United States Postal Service ("the Postal Service") and Grace and Ross Ponthie (collectively, "the Ponthies") over work done at the United States Post Office in Kiln, Mississippi ("the post office"). The Ponthies built the post office, which sits on land owned by the Postal Service, as well as its parking lot and driveway.

The first dispute stems from damage Hurricane Katrina dealt to the post office. The Ponthies agree that they are obligated under the parties' lease to make "repairs" needed as a result of acts of God, but assert that the Postal Service is holding them responsible for costs beyond mere "repairs." Additionally, they argue that the Postal Service violated the lease by not giving notice of the needed work. The Ponthies therefore move for summary judgment under Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"). The Postal Service opposes.

The second dispute concerns costs to remedy construction defects in and damage to the concrete of the parking lot and driveway. The Postal Service argues that the Ponthies are obligated to pay for those costs, since the concrete is thinner than provided for in the construction requirements. The Postal Service therefore moves for summary judgment. The Ponthies also move for summary judgment on this issue, and argue that the Postal Service's claims are barred by the lease itself, as well as the statute of limitations.

## I. *Factual Background*

On July 23, 1996, the Postal Service and the Ponthies entered into a lease for a post office in Kiln, Mississippi. Under the lease, the Ponthies were responsible for constructing a post office on land already owned by the Postal Service, as well as a parking lot and driveway, which the lease refers to as "appurtenances."[1] The lease runs from August 22, 1997 through August 21, 2017, and, at the end of that twenty-year term, the Ponthies must execute and deliver a bill of sale for the premises to the Postal Service. Rent is set at $60,000 per year, payable in equal monthly installments of $5,000. The lease is drafted on standard Postal Service forms and includes both a Construction Rider and a Maintenance Rider.

## A. *The Damage Done by Hurricane Katrina*

Hurricane Katrina made landfall in Kiln on August 29, 2005. In its wake, the Postal Service contracted with URS Group, Inc. ("URS Group") and Tony Watson Electric, Inc. ("Watson Electric") to remedy damage done to the post office.

URS Group performed work from September 13, 2005 through September 16, 2005 and was paid $241,538.76 by the Postal Service. In early September, before URS Group had performed any work, the Postal Service attempted to contact the Ponthies by phone to inform them of the needed work, but did not provide them with written notice of the need for work.[2]

The work performed by URS Group and its subcontractors broadly covered restoring the post office to its pre-hurricane state. According to a December 20, 2005 scope of work statement, the "objective" of URS Group's work was "to provide the USPS with oversight services during the cleaning of the Kiln facility" and to ensure the removal of "all water laden materials, dust/sludge debris . . . from the facility and debris from outside and around the facilities . . . in order to expedite the reopening of the facility."[3] A subcontractor, Clean Harbors Environmental Services, Inc. ("Clean Harbors"), performed the actual cleaning, and a January 2005 summary of the work from URS Group describes the work actually completed by Clean Harbors: "removal of excessive branches, leaves, trash, silt, and standing water . . . moving all furniture, letter cases, work stations, and miscellaneous equipment to the parking lots, cleaning those items, and returning them to the interior of the facility, hanging temporary sheeting as barriers, and miscellaneous plumbing repairs" as well as removing and

---

1. Pls.' Mot. Summ. J. Ex. 1, at 263. Under RCFC 5.5(c)(6), "All pages, including appendices, must be numbered in large distinct type that appears in the center of the bottom margin of the page." Except for the documents attached to Defendant's Response To Plaintiffs' Motion For Summary Judgment, the parties have used inconsistent or nonexistent pagination. In citing to the submitted exhibits, the Court has attempted to clearly specify the relevant exhibit and has used supplied pagination, where available. Future filings shall comply with RCFC 5.5(c)(6).

2. *See* Def.'s Resp. Pls.' Mot. Summ. J. Ex. D, at 40–41.

3. Pls.' Mot. Summ. J. Ex. 2, at 1.

disposing of "water-laden building materials including dry wall, Masonite™ (pegboard), wood finishes, paper, etc." [4]

Watson Electric worked on the roof and floors of the post office between September 21, 2005 and December 5, 2005, as well as in April 2006. The Postal Service did send the Ponthies written notice of the needed roof repairs, but not until December 15, 2005. That notice asked for completion of the work by December 31, 2005. According to the certified mail receipt, the Ponthies did not receive this notice until January 3, 2006, and they did not hire a contractor to perform the work by the completion date. The Postal Service paid Watson Electric $78,557.29 for their services.

On March 3, 2008, Contracting Officer Jean Scholl Berg found that the Ponthies were obligated under the lease to pay for the full cost of the services performed by URS Group and Watson Electric. These services, including $50,618.36 in interest, amount to $371,526.47, and the Postal Service began withholding $4,953.69 of their $5,000 monthly rent on March 1, 2008. This deduction will continue for 75 months from that date.

### B. Construction Deficiencies and Damage to the Driveway and Parking Lot

Under the lease, the Ponthies were obligated to install concrete paving at least five inches thick in the driveway and parking lot, which the Postal Service accepted and began using in the fall of 1997. [5] According to the Postal Service, they had problems with the lot and driveway "[a]t least as early as 1998[.]" [6] On April 17, 2006, the Postal Service informed the Ponthies that a review of the paved areas revealed that they were of "erratic thickness of concrete" and ranged from 2.5 to 8.5 inches in depth. [7] The letter informed the Ponthies that it was their responsibility to rebuild the concrete, and demanded a schedule of repairs by April 24, 2006. The Ponthies responded on May 1, 2006, denied responsibility for the defective pavement, and refused to repair the concrete.

On October 16, 2006, Contracting Officer Jody Sloan informed the Ponthies that the Postal Service was going to begin repairs, and the Postal Service later contracted with Watson Electric to repour the concrete.

After this lawsuit was brought, Contracting Officer Berg issued a September 29, 2009 final decision and found the Ponthies responsible for $136,240.43 in pavement repairs. The Postal Service plans to begin withholding from the monthly rent in October 2014, after they have finished withholding payments for the hurricane damage.

### C. Procedural History

The Ponthies filed suit on March 2, 2009, and the government filed a counterclaim for the pavement repairs on June 30, 2009. On November 22, 2010, after the close of discovery, the Ponthies filed a Motion For Summary Judgment, and the Postal Service filed a Motion For Partial Summary Judgment. The parties filed responses on January 28, 2011, and replies on February 11, 2011.

## II. Discussion

Both parties move for summary judgment under RCFC 56(c). The Ponthies move for summary judgment on both issues, but the government has only moved for summary judgment on the pavement issue.

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1); see also Consolidation Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed.Cir.2010). The movant carries the initial burden of showing that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A material fact is one that "might affect the outcome of the suit," and a dispute

---

4. Def.'s Resp. Pls.' Mot. Summ. J. Ex. A, at 8.

5. Def.'s Mot. Partial Summ. J. Ex. C, at 1129.

6. Def.'s Mot. Partial Summ. J. 5.

7. Def.'s Mot. Partial Summ. J. Ex. E, at 123.

is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed.Cir.2007). In reviewing the facts, "all justifiable inferences are to be drawn" in favor of the party opposing summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. Once the movant has shown that no genuine issue of material fact exists, the party opposing summary judgment must demonstrate that such an issue does, in fact, exist. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. To establish a genuine issue of material fact, a party "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir.1985). If the party opposing fails to make this showing, entry of summary judgment is "mandate[d]." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. *Contract Interpretation*

When called upon to interpret a contract, a court first examines "the plain language of the contract." *M.A. Mortenson Co. v. Brownlee*, 363 F.3d 1203, 1206 (Fed.Cir. 2004). Words must be "given their plain and ordinary meaning[.]" *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir.1987) (internal quotation omitted). An objective test is used to determine the meaning of words, and a court must apply the "meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct.Cl.1965). If a contract is ambiguous, a court may examine extrinsic evidence to clarify the intent of the parties. *TEG–Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir.2006).

### C. *Costs for Remedying the Damage Done by Hurricane Katrina*

The Ponthies have moved for summary judgment on their responsibility for the costs to clean or repair the post office itself. The Postal Service opposes summary judgment, but does not itself move for summary judgment on the issue.

#### 1. Repairs v. Cleaning

Two sections of the lease obligate the Ponthies to perform repairs needed because of acts of God. Under Paragraph A.23, "[i]f the demised premises or any portion thereof are damaged ... by ... Act of God ... the Postal Service may ... require the Lessor to repair or rebuild the premises as necessary to restore them to tenantable condition to the satisfaction of the Postal Service."[8] Similarly, under the Maintenance Rider to the lease, the Postal Service is responsible "for ordinary repairs to, and maintenance of the demised premises," while the Ponthies are responsible for "[r]epairs resulting from Acts of God[.]"[9]

■ The parties disagree about what constitutes a "repair." According to the Ponthies, the Postal Service wants the Ponthies to pay for not just repairing the facility but also for cleaning it. The Ponthies argue that "repair" and "cleaning" have legally "distinct and different definitions," and that they are only obligated to pay for repairs.[10] The Postal Service labels the alleged difference between these two words "an empty semantic distinction [that] does not excuse [the Ponthies] from their explicit contractual liability."[11]

The invoices from the Postal Service's contractors do use variations of both "repair" and "clean," as well as related words such as "restore." A December 20, 2005 scope of work statement from URS Group references "the cleaning of the Kiln facility[.]"[12] This document also mentions the "removal of litter and debris from the exterior of the facility," pressure washing of the exterior and interior of the building, removal of broken

---

8. Pls.' Mot. Summ. J. Ex. 1, at 277.

9. *Id.* at 287.

10. Pls.' Mot. Summ. J. 8.

11. Def.'s Resp. Pls.' Mot. Summ. J. 3.

12. Pls.' Mot. Summ. J. Ex. 2, at 1.

tree limbs and trash, and removal of interior water and silt.[13] Likewise, a January 2005 report by URS Group described their work as "cleanup and restoration services[.]"[14] The invoices from Watson Electric include charges for cleaning, furniture repair and replacement, and debris removal.[15]

The Ponthies argue that these services fall outside the scope of their "repair" obligation under the contract. As noted above, the starting point of contract interpretation is "the plain language of the contract." *M.A. Mortenson Co.*, 363 F.3d at 1206. The lease does not define "repair," so the Court looks to the dictionary for its meaning. The verb "repair" can mean "to restore by replacing a part or putting together what is torn or broken" or "to restore to a sound or healthy state." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1923 (2002). The verb "clean" can mean "to make clean or free of dirt or any foreign or offensive matter." *Id.* at 419.

The alleged distinction between the verbs "repair" and "clean" falls flat. Under the lease, the Ponthies must make repairs after an act of God, such as a hurricane. *See* BLACK'S LAW DICTIONARY 39 (9th ed. 2009) (defining "act of God" as an "overwhelming, unpreventable event caused exclusively by forces of nature"). Repairing the damage done by a hurricane might involve activity normally considered "cleaning." For instance, to repair damaged drywall, a contractor might need to remove the water that caused the damage, tear out the wet drywall, dry the area, and hang new drywall. Removing the "offensive matter" of stagnant water and damaged drywall could be labeled "cleaning," but that does not mean the process as a whole does not also constitute a "repair." Similarly, to repair a damaged roof, a contractor might need to clean off tree limbs and debris that have damaged the roof before working on the structure of the roof itself. Under the Ponthies' reasoning, a "repair" could apparently never include the removal of "dirt or any foreign or offensive matter," as that would be "cleaning." The Court disagrees.

To prevail on a motion for summary judgment, a movant must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. The Ponthies have not shown that the work done by the Postal Service's contractors is necessarily, as a legal matter, outside the bounds of the "repairs" that they were obligated to perform under the lease. Summary judgment is therefore denied.[16]

2. Notice Requirement

■ The Ponthies also argue that the Postal Service failed to abide by the notice requirement of the Maintenance Rider, and that they are thus not liable for the work performed. If repairs are needed, the Postal Service must give written notice of the repairs and set a "reasonable deadline for completion of the work."[17] This requirement, however, does not apply in the case of "emergencies."[18]

Much of the work done by the Postal Service's contractors was done without written notice. URS Group performed cleanup and restoration work approximately two weeks after Hurricane Katrina hit, from September 13 to September 16, 2005, and Watson Electric performed work on the roof and carpets between September 21, 2005 and December 5, 2005, as well as in April 2006. Although the Postal Service attempted to contact the Ponthies by phone numerous times, the lease requires written notice, which was not given until December 15, 2005. This notice was sent by both certified and first-class mail, and asked for completion of the work by December 30, 2005. According to the certified mail receipt, the Ponthies did not receive the letter via that method until January 3, 2006. The notice also only cov-

---

13. *Id.* at 2.

14. Def.'s Resp. Pls.' Mot. Summ. J. Ex. A, at 3.

15. Pls.' Mot. Summ. J. Ex. 5.

16. The Postal Service has not moved for summary judgment on this issue, and the Court's holding does not endorse defendant's interpreta-

tion. The holding is limited to finding that the Ponthies have not met their summary judgment burden.

17. Pls.' Mot. Summ. J. Ex. 1, at 287.

18. *Id.*

ered "roof work" at the facility.[19] This notice, by itself, would likely have been insufficient to cover the repair work, much of which had already been performed by that date.

The lease, however, exempts the Postal Service from the notice requirement "in emergencies," which the lease does not define. An "emergency" is "an unforeseen combination of circumstances or the resulting state that calls for immediate action," such as "a pressing need." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 741 (2002). The aftermath of a serious hurricane and the urgent need to restore postal service could qualify as an emergency.

Facts sufficient to determine what work, if any, the emergency exception covered are not before the Court. While the exception may have covered work performed in the hurricane's immediate wake, the Postal Service also may have been obligated to give the Ponthies written notice earlier than December. Furthermore, since the Postal Service was able to telephone the Ponthies despite the hurricane's damage, the Postal Service will need to show why an "emergency" prevented written notice. The lease also requires a "reasonable deadline," but the Postal Service gave the Ponthies, at most, two weeks to complete major roof repairs. These are all genuine factual issues that directly implicate the Ponthies' liability for costs. Summary judgment on this issue is therefore denied.

### 3. Implied Duty of Good Faith and Fair Dealing

■ Contracting partners owe each other an implied duty of good faith and fair dealing. *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed.Cir.2005). The Ponthies argue that the Postal Service breached this duty through incurring costs for services and forcing the Ponthies to bear those costs, without providing written notice, as well as by deducting the amount of those services from the rent.

Summary judgment on this issue is inappropriate. As noted above, the Postal Ser-

vice may have been relieved of their notice obligation by the "emergency" exception. Furthermore, the lease allows the Postal Service to, in some situations, deduct the cost of repairs from rental payments, and the Ponthies have not shown that portion to be inapplicable here.

### D. *Costs for Remedying Construction Defects in the Parking Lot and Driveway*

The second issue in this case concerns the Ponthies' liability for costs related to the driveway and parking lot. On September 29, 2009, Contracting Officer Berg found that the Ponthies were liable for $136,240.43 for repairing the parking lot and driveway to the post office. The Postal Service moves for summary judgment and argues that the lease obligates the Ponthies to fix the defects in the parking lot and driveway. The Ponthies oppose and also move for summary judgment on this issue.

The driveway and parking lot do not meet the construction requirements found in the lease. Under the Construction Rider, the Ponthies were obligated to construct a parking lot and driveway in accordance with "Plan 40A, dated 12/19/95, containing Sheets A–1 through A–16 ... which are made a part of this Lease."[20] Those plans require at least five-inch thick concrete paving.[21] The Ponthies do not disagree that the lease requires five-inch thick concrete, nor do they disagree that a 2006 analysis of the pavement by Studio South Architects reported a thickness of less than five inches, in some places. The Ponthies, however, argue that a one-year construction warranty has expired and that the statute of limitations has run on defendant's claims.

### 1. The Ponthies' Obligations Under the Lease for Construction Defects

■ The parties disagree about the interaction of four provisions in the lease relating to construction defects. The Postal Service construes the following provisions to find a lease-long obligation to remedy any construc-

---

19. Pls.' Mot. Summ. J. Ex. 8, at 137.

20. Pls.' Mot. Summ. J. Ex. 1, at 283.

21. Def.'s Mot. Partial Summ. J. Ex. C (drawing numbers 4, 6, 7, 8, and 9).

tion defects, while the Ponthies find only a limited, year-long obligation related to these defects. The Court disagrees with both parties' interpretations.

The first provision is the Ponthies' obligation under the "Inspection" section of the Construction Rider to remedy construction defects:

7. INSPECTION

a. The Lessor must, without charge, replace any material, correct any workmanship or supply omitted work found by the Postal Service not to comply with the contract requirements....

b. The premises and building must be accessible for inspection by the authorized representative of the contracting officer to determine whether contractual requirements are being met during construction and/or acceptance inspection of construction of the facility. Failure of the Postal Service to identify deficient work or materials shall not shift the responsibility for correction of such deficient work or materials to the Postal Service.

....

e. The Lessor must give the contracting officer at least thirty (30) days advance written notice of the date the work will be fully completed and ready for acceptance inspection and tests[.] [22]

The second relevant provision is the Construction Rider's one-year warranty against construction defects:

If, within one year of acceptance for beneficial occupancy by the Postal Service, the contracting officer finds that warranted work needs to be repaired or changed because materials, equipment, or workmanship were inferior, defective, or not in accordance with the contract terms, the Lessor must promptly and without additional expense to the Postal Service—

1. Place in a satisfactory condition all of the warranted work;

2. Satisfactorily correct all damage to equipment, the site, the building, or its contents that is the result of such unsatisfactory work; and

3. Satisfactorily correct any work, materials, or equipment disturbed in fulfilling the warranty.[23]

Third, the Construction Rider specifies, "The provisions of this Construction Rider, including any and all drawings, specifications, details, handbooks and other attachments made a part of the Lease, hereunder, shall govern in the event of conflict with any other terms and conditions of the Lease." [24] Finally, the Maintenance Rider makes the Ponthies responsible for "[r]epairs resulting from defects in building construction or installation of equipment, fixtures, or appurtenances furnished by the Lessor." [25]

This Court must "when possible" interpret a contract "as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed.Cir.1992). Both parties have provided limited constructions of the contract and failed to satisfactorily reconcile all four relevant provisions. According to the Ponthies, the Construction Rider's one-year warranty essentially replaces and limits the Maintenance Rider's provisions. This interpretation renders the Maintenance Rider's obligations surplusage and ineffective. According to the Postal Service, a sentence in the inspection portion of the Construction Rider modifies the construction warranty, which appears thirteen sections later, and removes the warranty's time limit. This interpretation fails to mind the plain language of the construction warranty that specifies that it only lasts for "one year" after acceptance.[26]

As interpreted by the Court, the sections that the parties cite contain three related, but distinct, obligations. First, under Paragraph 7 of the Construction Rider, the Ponthies had obligations related to "Inspection."

22. Pls.' Mot. Summ. J. Ex. 1, at 284.

23. *Id.* at 285.

24. *Id.* at 283.

25. *Id.* at 287.

26. *Id.* at 285.

While the post office was under construction, the Ponthies had to keep it "accessible for inspection," and they had to provide notice of when it would be completed so that the Postal Service could conduct an "acceptance inspection" of the premises.[27] If during either of these inspections, the Postal Service found anything that failed to comply with the construction requirements, then the Ponthies were obligated to remedy that deficiency at no charge to the Postal Service. If the Postal Service conducted an inspection but did not notice an error, their "[f]ailure ... to identify deficient work" did not "shift the responsibility for correction of such deficient work ... to the Postal Service."[28] For instance, if the Postal Service had conducted an inspection and failed to notice that the concrete did not meet the contract's standards, the Postal Service's failure to notice that defect during the inspection would not free the Ponthies' from their obligations under Paragraph 7. Following "construction and/or acceptance inspection of construction of the facility," however, these Paragraph 7 inspection obligations terminated, since both "construction" and the "acceptance inspection" were complete.[29]

Under Paragraph 20 of the Construction Rider, the Ponthies also gave a one-year construction warranty for the post office. This warranty required the Ponthies to correct, at no cost to the Postal Service, any work that was "inferior, defective, or not in accordance with the contract terms[.]"[30] For instance, if the Postal Service had discovered during that first year that the concrete was thinner than required by the contract, then the Ponthies would have been obligated to correct that deficiency "promptly and without additional expense to the Postal Service."[31] This warranty, however, only lasted for "one year," and the lease references the "time limit requirements specified in the ... warranty[.]"[32] Consistent with that time limit, the Postal Service performed

a "one-year warranty inspection" on August 18, 1998, prior to the expiration of the construction warranty.[33] As noted above, the Court in interpreting a contract must examine the "plain language of the contract." *M.A. Mortenson Co.*, 363 F.3d at 1206. If the written agreement has a "plain and unambiguous meaning," then that meaning controls. *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed.Cir.1991). Here, the contract plainly states that the warranty only lasts for "one year" from acceptance of the post office. That meaning must control.

The Postal Service argues that a clause in Paragraph 7 modifies the construction warranty in Paragraph 20, but this interpretation fails to reasonably interpret the contract "as a whole[.]" *Granite Constr. Co.*, 962 F.2d at 1003. As discussed above, Paragraph 7, which is labeled "Inspection," provides in part: "Failure of the Postal Service to identify deficient work or materials shall not shift the responsibility for correction of such deficient work or materials to the Postal Service."[34] The Postal Service argues that the effect of this sentence is to remove the time limit from the construction warranty, which appears thirteen sections later under the heading "Warranty (Construction)." When interpreting a contract, a court should attempt to give effect to "every word, phrase or term" of a contract, including headings. 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32:5 (4th ed. 2010); *see also Muniz v. United States*, 972 F.2d 1304, 1320 (Fed. Cir.1992) ("A cardinal rule of contract interpretation requires that an interpretation which gives meaning to all parts of a contract will be preferred to one which leaves a portion of it useless, inoperative, meaningless or superfluous."). Reading this contract as a whole, it is clear that there are two separate bundles of obligations relevant here: those related to inspection and those related to the

27. *Id.* at 284.

28. *Id.*

29. *Id.*

30. *Id.* at 285.

31. *Id.*

32. *Id.*

33. Def.'s Mot. Partial Summ. J. Ex. D, at 142.

34. Pls.' Mot. Summ. J. Ex. 1, at 284.

construction warranty. The Postal Service's attempt to modify the construction warranty with a sentence from the inspection provision is not a sensible interpretation of the contract, since those two obligations are clearly separated into two different areas of the contract, and do not reference each other.

The Postal Service accepted the post office for occupancy in 1997, and the one-year warranty therefore expired in 1998. Even though the warranty had expired, the Ponthies still had obligations under the Maintenance Rider, which has no time limit. The Rider makes them responsible for "[r]epairs *resulting from* defects in building construction or installation of equipment, fixtures, or appurtenances[.]" [35] This language is quite different from that used to describe the Ponthies' inspection and construction warranty obligations in the Construction Rider. The inspection obligation applied categorically to "any" work found "not to comply with the contract requirements," [36] and, likewise, the warranty requires that "all work" must be "in accordance with the contract terms." [37] The Maintenance Rider's coverage is noticeably less categorical: the Ponthies are not responsible generally for work that does not meet construction guidelines, but they are responsible for "repairs" that "result[ ] from" construction defects.[38] Interpreting this contract "as a whole" and giving "reasonable meaning to all its parts," the markedly different descriptions of the Ponthies' obligations make clear that the scope of their Maintenance Rider obligation is more limited. *Granite Constr. Co.*, 962 F.2d at 1003. Unlike the Construction Rider obligations, however, the Maintenance Rider obligation has no time limit and extends for the duration of the lease.

Both parties' motions for summary judgment are therefore denied. The Ponthies are incorrect in asserting that the Construction Rider's warranty supersedes the Maintenance Rider's obligations, and the Postal Service is incorrect that the "one year" warranty has no time limit. While the Construction Rider does govern in the case of a conflict, there is no conflict here. The Construction Rider deals with remedying deficient construction during and shortly after the construction itself, while the Maintenance Rider contains a different obligation that extends for the duration of the lease. The Ponthies are thus responsible under the Maintenance Rider for "[r]epairs resulting from defects in ... construction or installation[.]" [39] If defects cause anything to become "broken" or to need to be restored "to a sound or healthy state," then the Ponthies would be responsible for the costs to make those repairs. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1923 (2002).

██ Since the lease makes the Ponthies responsible for some types of repairs, the key remaining issue is a factual one: whether the damage that occurred to the parking lot and driveway was caused by something for which the Ponthies bear responsibility, or by another cause for which they are not responsible. The report prepared for the Postal Service by Studio South Architects notes that the pavement failed due to "one or a combination of: poor quality and lack of compaction of subsoil and base materials, elevated site groundwater, thin concrete section and lack of reinforcement." [40] Furthermore, in 2001, employees of the Postal Service were concerned about damage done to the driveway by the "heavy wear and tear" from construction done by their neighbors.[41] Summary judgment is thus premature, since it is unclear from the record what the precise causes of the damage were and how much each cause contributed to the damage.

### 2. The Statute of Limitations

██ Whatever their obligations are to make repairs due to construction defects, the Ponthies argue that the statute of limitations has run and thus bars the Postal Service

---

35. *Id.* at 287 (emphasis added).

36. *Id.* at 284.

37. *Id.* at 285.

38. *Id.* at 287.

39. *Id.*

40. Def.'s Mot. Summ. J. Ex. F.

41. Pls.' Mot. Summ. J. Ex. 10, at 139.

from bringing their claim. Under this Court's statute of limitations, "[e]very claim ... shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2006).[42] This statute is "jurisdictional" and an "absolute" bar to untimely claims. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008). A claim "accrues when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action." *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed.Cir.1995). Generally, a claim for contract breach accrues when a party knew or "should have known" it had been damaged by the breach. *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 878 (Fed.Cir.1998); *see also Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998) (" '[I]n the case of a breach of a contract a cause of action accrues when the breach occurs.' ") (quoting *Mfrs. Aircraft Ass'n v. United States*, 77 Ct.Cl. 481, 523 (1933)).

■ The Postal Service was aware of some damage to the driveway in 2001. In a March 2001 series of emails, Postmaster Richard Baker complained of a large section of concrete that was crumbling. Baker told Contracting Officer Jody Sloan that there were a number of contributing causes, including probable "poor work to begin with" by the contractors, and he mentioned an earlier "crack in the concrete" that the Ponthies' contractor had repaired under the construction warranty.[43] The new problems, Baker noted, were "at the end of" the old crack, near some concrete that the contractor had repoured.[44] Baker thought "[i]t would be hard to determine the direct cause of the damage."[45] It was not until 2006, however, that the Postal Service actually received the report from Studio South Architects and learned that the concrete was far thinner than it should have been under the contract.

If the Postal Service knew or should have known in 2001 or earlier that the Ponthies had incorrectly installed the driveway in violation of the agreement, then the claim accrued at that time. Issues of fact, however, exist as to whether or not the Postal Service knew this. Although the government was aware of some damage, it is unclear from the facts before the Court whether the Postal Service had enough information regarding the damage and defects to bring suit against the Ponthies for breach of contract. Summary judgment is therefore inappropriate.

III. *Conclusion*

For the above-mentioned reasons, Plaintiffs' Motion For Summary Judgment is DENIED, and Defendant's Motion For Partial Summary Judgment is DENIED.

The Court encourages the parties to amicably resolve this dispute, and they may make use of the Alternative Dispute Resolution services outlined in RCFC Appendix H. If the parties are unable to resolve the dispute, they shall submit by Monday, May 16, 2011 a Joint Status Report with a proposed schedule of further proceedings.

IT IS SO ORDERED.

---

42. The Ponthies cited 28 U.S.C. § 2415(a) (2006) for the statute of limitations, but the applicable statute for the Court of Federal Claims is found not there but at § 2501.

